**UNITED STATES of America**

v.

**Alfred ZEHE.**

**Cr. No. 83–296–N.**

United States District Court,
D. Massachusetts.

Jan. 29, 1985.

---

Nancy Gertner, Harvey Silverglate, Jeanne Baker, Silverglate, Gertner, Baker & Fine, Boston, Mass., for Alfred Zehe.

## MEMORANDUM OPINION

DAVID S. NELSON, District Judge.

The United States government brings this criminal prosecution under the Espionage Act (the Act), 18 U.S.C. §§ 792–99, against Alfred Zehe, an East German citizen, for alleged acts of espionage against the United States committed in Mexico and the German Democratic Republic. Zehe moves for dismissal of the indictment, contending that the Act fails to confer jurisdiction over acts of espionage committed outside of this country's territorial boundaries by persons who are not citizens of the United States.[1] This Court on January 2, 1985 denied the defendant's motion and now offers this Memorandum Opinion in support of that ruling.

The Espionage Act proscribes various acts of collecting and disclosing national defense information to a foreign nation. The defendant is charged under §§ 793(b), 794(a) and 794(c) of the Act in eight counts alleging that he (1) unlawfully sought and obtained information regarding this country's national defense, (2) delivered that information to the German Democratic Republic, and (3) conspired to deliver such information, all with the intent that the information be used to the injury of the United States or to the advantage of the German Democratic Republic. These sections provide, in pertinent part, that "[w]hoever ... copies, takes, makes or obtains ... any sketch, photograph, ... document, writing, or note of anything connected with the national defense," *id.* § 793(b) or "[w]hoever ... communicates, delivers, or transmits ... any document, writing, ... or information relating to the national defense," *id.* § 794(a) or conspires to so communicate, *id.* § 794(c), all with the requisite intent, shall be punished. These sections do not, nor does the Act elsewhere, define the territorial scope of the Act.

There is no question, nor does Zehe contest, that the Act applies to extraterritorial acts of espionage committed by citizens. Although no provision of the Act explicitly so states, the courts have consistently inferred such extraterritorial application to citizens when the proscribed offense tended to impair important governmental functions and when the United States government was vulnerable to the offense regardless of where it was committed. *See United States v. Bowman,* 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922) (fraud against a government corporation); *United States v. Cotten,* 471 F.2d 744, 749–51 (9th Cir.1973) (theft of government property); *United States v. Birch,* 470 F.2d 808, 811–12 (4th Cir.1972) (forgery or false use of government documents). In these three cases, the courts expressly relied upon the nature of the offenses, and not just upon the citizenship of the defendants, in order to apply other criminal statutes extraterritorially to citizens. Because espionage is

---

**1.** This jurisdictional inquiry arguably is only pertinent to the Court's consideration of Counts Two through Eight of the indictment because these counts allege substantive offenses occurring wholly outside of United States territory. Count One, by contrast, alleges an ongoing conspiracy with overt acts, some of which the government now claims occurred within the United States, on the premises of the East German embassy in Washington, D.C. and elsewhere. The defendant argues that any alleged acts, even if proved, could not serve as a basis of jurisdiction if committed by East German diplomats on embassy premises. The government counters that regardless of the significance of acts committed on the embassy premises, other overt acts—particularly the mailing of postcards—in furtherance of the conspiracy were committed outside of those premises and within the United States. The Court finds it unnecessary to resolve this dispute since jurisdiction is independently appropriate over Count One under the analysis set forth below.

an offense threatening the national security of the United States, regardless of where it occurs, the Court readily concludes that the Espionage Act was meant to apply extraterritorially to citizens.[2]

Furthermore, the legislative history of the Act unequivocally supports the application of the Act to citizens who commit acts of espionage against the United States while abroad. Until 1961, the Act by its express terms applied only "within the admiralty and maritime jurisdiction of the United States and on the high seas, as well as within the United States." 18 U.S.C. § 791 (repealed 1961). Congress' repeal of this territorial limitation in 1961, P.L. 87–369, 75 Stat. 795, was prompted primarily by a highly publicized case of a citizen who had delivered secret information to foreign countries. *See, e.g.,* 107 Cong.Rec. 10,668 (1961) (statement of Rep. Poff). Thus, congressional intent to apply the Act extraterritorially to citizens could not be clearer.

■ Nor is there any dispute that Congress has the power to prosecute both citizens and noncitizens for espionage committed outside of this country's territorial limits. The defendant concedes that under principles of international law recognized by United States courts, Congress is competent to punish criminal acts, wherever and by whomever committed, that threaten national security or directly obstruct governmental functions.[3] *See, e.g., United States v. Bowman,* 260 U.S. at 98, 43 S.Ct. at 41; *United States v. Columba-Colella,* 604 F.2d 356, 358 (5th Cir.1979); *United States v. Pizzarusso,* 388 F.2d 8, 9–10 (2d

Cir.1968); Restatement (Second) of Foreign Relations §[l] 33 (1965); Harvard Research in International Law, *Jurisdiction with Respect to Crime,* 29 Am.J.Int'l L. 435, 543 (Supp.1935). Espionage against the United States, because it is a crime that by definition threatens this country's security, can therefore be punished by Congress even if committed by a noncitizen outside the United States. *See* Restatement (Second) of Foreign Relations Law § 402(3) comment d, at 99 (Tent. Draft No. 2 1981) (citing espionage as an example of an offense that a state can punish even if committed outside its territory by persons who are not its citizens).

The defendant, while agreeing that the Espionage Act has extraterritorial application to citizens and that Congress is empowered to assert extraterritorial jurisdiction over noncitizens as well as citizens, nonetheless contends that the Act was not meant to apply to noncitizens acting entirely outside of the United States.[4] Zehe asserts that in order to apply a criminal statute to acts committed by noncitizens beyond this country's territorial boundaries, there must be a strong and clear showing of congressional intent. In the case of the Espionage Act, the defendant maintains that the legislative history behind the repeal of § 791's territorial language unmistakably supports the conclusion that Congress intended to reach only the extraterritorial actions of citizens. The Court believes, however, that the intent of the repeal was simply to remove the territorial

---

**2.** One court has already applied the Act to a citizen who allegedly committed acts of espionage while abroad. *United States v. Helmich,* 521 F.Supp. 1246, 1252 (M.D.Fla.1981).

**3.** The defendant acknowledges in his further briefing that "the protective principle, though rarely used, had been a part of the jurisprudence of this country both before 1961 and in 1961, when Congress enacted the statutory amendment at issue here." Under international law, the "protective principle" gives a country the "jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions,

provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems." Restatement (Second) of Foreign Relations § 33 (1965).

**4.** Under the defendant's reading of the Act, courts could assert extraterritorial jurisdiction over noncitizens in just two situations: (1) in cases where a noncitizen while abroad had conspired with a citizen to collect or disseminate defense information of the United States, even if no act occurred within this country; and (2) in cases where a noncitizen while abroad had conspired with another noncitizen who committed overt acts in the United States.

restrictions on an Act that had always applied to both citizens and noncitizens.

The defendant relies on various references in the legislative record to argue that Congress did not intend to assert jurisdiction over actions of noncitizens while abroad. In particular, he points to three series of statements: first, to the language in the House Report accompanying the bill that repealed § 791 that refers to *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), as the authority for asserting extraterritorial jurisdiction over citizens, H.R.Rep. No. 452, 87th Cong., 1st Sess. 1–3 (1961); second, to the statement by Deputy Attorney General Lawrence Walsh that, in his opinion, the Act could not constitutionally be applied to noncitizens acting outside of the United States, Hearings, Senate Comm. on the Judiciary, 86th Cong., 1st Sess., Pt. 1 at 396–98 (1959); and third, to various testimony in the Senate hearings suggesting that it would be preferable to add language limiting the Act to "residents and citizens of the United States throughout the world," *id.* at 253.

The Court does not find the defendant's legislative evidence persuasive. References in the House Report to the rule of *Bowman,* a case that extended extraterritorial jurisdiction over citizens, do not mean that Congress intended to preclude the assertion of extraterritorial jurisdiction over noncitizens. The House committee cited *Bowman* to indicate that Congress had the power to give criminal laws extraterritorial effect, not to limit the repeal of the territorial limitation to only citizens. H.R.Rep. No. 452, *supra,* at 1. Furthermore, *Bowman* contains a general exposition of how congressional intent to apply a statute extraterritorially can be inferred and does not limit its reasoning to citizens. 260 U.S. at 98, 43 S.Ct. at 41. As for Mr. Walsh's opinion as to the constitutionality of Con-

gress reaching out to acts of noncitizens outside the United States, he is simply incorrect and the defendant has not argued otherwise. *See Rocha v. United States,* 288 F.2d 545, 549 (9th Cir.1961).

Finally, the defendant's reliance on testimony suggesting that Congress should have limited the extraterritorial effect of the Act to "residents and citizens" undercuts the defendant's own conclusions. Although it was suggested that extraterritorial jurisdiction over noncitizens could easily be avoided by explicitly restricting the Act's application to "residents and citizens of the United States throughout the world,"[5] no such language was adopted. Congress ignored an explicit warning that the Act would, after the repeal of § 791, apply to noncitizens committing espionage outside the United States.[6]

The failure of Congress to respond to this warning belies another principal argument advanced by defendant—that the legislative history's repeated references to citizens and its alleged silence as to noncitizens manifest an intention to address only acts of espionage committed by the former. To the contrary, direct testimony warning Congress that the repeal of § 791 would extend the scope of the Act to extraterritorial acts of noncitizens was explicitly proffered, thus indicating that Congress contemplated the effect of the repeal on noncitizens. Although Congress' primary objective in the repeal may have been to assert extraterritorial jurisdiction over citizens in the wake of a highly publicized case of a citizen who passed secret information to another country, this motivation does not preclude Congress from also intending to reach out to noncitizens. Congress' desire to extend jurisdiction of the Act to citizens abroad may have been just one aspect of a more general concern that limiting the scope of the espionage laws was

5. Testimony of Professor Roger Fisher, Hearings, Senate Comm. on the Judiciary, 86th Cong., 1st Sess., Pt. 1, at 253 (1959).

6. Professor Fisher testified that "the statute [H.R. 1992 proposing the repeal of § 791] would make it a crime for a local national, acting in the interest of his own government, within his own country, to take a picture of U.S. military equipment that was there, if the purpose were to aid his own government." *Id.*

hampering the effective prosecution of espionage crimes.

Indeed, the Act had never in the past distinguished between citizens and noncitizens. Before the repeal of § 791's territorial limitation on the Act's jurisdiction, the Act proscribed acts of espionage within United States territorial limits and the high seas without regard to the nationality of the offender. *See, e.g., Gorin v. United States,* 312 U.S. 19, 22, 61 S.Ct. 429, 431, 85 L.Ed. 488 (1941) (involving prosecution under §§ 1 and 2 of the Espionage Act of 1917, 50 U.S.C. §§ 31, 36, recodified without material change at 18 U.S.C. §§ 793, 794); *United States v. Abel,* 258 F.2d 485, 487–88 (2d Cir.1958), *aff'd on other grounds,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Given Congress' failure to distinguish between citizens and noncitizens when repealing the territorial restriction, the Court sees no reason to infer that the Act does not continue to apply to both citizens and noncitizens. Therefore, the Court finds that the legislative record, although sparse and at times ambiguous, does indicate that Congress meant the Act to apply extraterritorially to noncitizens as well as citizens.

■ In any event, although the Court agrees that there must be strong and clear evidence of congressional intent to apply a criminal law beyond this country's territorial boundaries to noncitizens, legislative history is not the sole or primary means of determining congressional intent.[7] Courts have often inferred congressional intent to apply penal statutes to offenses committed abroad from the nature of the proscribed act, with only marginal reliance on, or even no reference at all to, the legislative history. In particular, as discussed previously, in cases involving citizens, courts have

found congressional intent to give a statute extraterritorial effect when the offense interferes with governmental operations and can be committed as easily outside as inside the United States. Although these cases may have depended in part on the fact that the defendants were citizens, courts in the case of noncitizens have similarly looked to the essence of the act Congress sought to punish in order to discern congressional intent to apply a criminal statute extraterritorially. In *United States v. Pizzarusso,* 388 F.2d at 9, the court reasoned that intent could be inferred from a logical reading of a statute punishing false statements on visa applications. The court concluded that, because such false statements would ordinarily occur outside of the United States, Congress intended to apply the statute extraterritorially to noncitizens. *See also United States v. Rodriguez,* 182 F.Supp. 479, 484–86 (S.D. Cal.1960), *aff'd in part and rev'd on other grounds sub nom. Rocha v. United States,* 288 F.2d 545, 549 (9th Cir.1961) (same). In neither case did the court even mention the legislative history of the statute at issue.

Following this analysis, the Court finds strong congressional intent to apply the Espionage Act to the extraterritorial acts of noncitizens both from the face of the statute and from the nature of the crime of espionage. First, as noted previously, the Act makes no distinction between citizens and noncitizens. Second, espionage is an offense that is as likely to occur within foreign countries as within this country because of the large number of United States defense installations and military personnel located abroad. Furthermore, the essence of an espionage crime is that it is directed against the national security of a country and so does not logically depend on locality. The Court hence finds it rea-

---

7. Even the defendant's assertions implicitly concede that legislative history does not give the definitive answer in statutory construction. Zehe concedes that the Act has at least limited extraterritorial applicability to foreign nationals. *See* note 4 *supra.* However, the defendant does not depend on support in the legislative history for such an interpretation, but must rely on a fair reading of the Act. It is true that there

must be a strong showing of congressional intent to give a statute extraterritorial applicability, but it is rare that this burden can be met through a legislative record that is unequivocal. On the question of the Act's applicability to citizens who commit acts of espionage abroad, the record is unmistakable, but every reading of congressional intent need not be so strong.

sonable to infer that Congress intended to assert jurisdiction up to the limits of international law and prosecute noncitizens for espionage against the United States regardless of where the act of obtaining or disclosing defense information in fact occurred.

Finally, the defendant questions the policy implications of applying the Act to noncitizens who might merely have reviewed defense documents supplied to them by their respective governments. The Court does not find the defendant's scenario likely. Under the statutorily defined crimes of espionage in §§ 793 and 794, noncitizens would be subject to prosecution only if they actively sought out and obtained or delivered defense information to a foreign government or conspired to do so.

The defendant in his arguments has relied solely on legislative history to discern congressional intent, and in so doing has misapprehended the broad intent behind the repeal of the territorial limitation—to allow full enforcement of the espionage laws wherever the offense may be committed. The defendant has failed to give serious credence to expansive jurisdictional statements explaining that the purpose of the proposed repeal "is to extend the application of [the act] ... to acts committed anywhere in the world," H.R.Rep. No. 452, *supra*, at 1, because "it is imperative that the laws of this Nation protect it from acts of espionage committed abroad as well as at home." *Id.* The Court finds that the Act may be applied extraterritorially to both citizens and noncitizens because of the threat to national security that espionage poses. It is for the foregoing reasons that this Court denied the defendant's motion to dismiss for lack of subject matter jurisdiction.