# Executive Branch Encouragement of Contributions to a Nicaraguan Opposition Party

No provision of United States law precludes the President or members of his Administration from encouraging private parties to contribute funds to the National Opposition Union, a Nicaraguan political party, for use in the scheduled Nicaraguan elections.

January 25, 1990

MEMORANDUM OPINION FOR THE ASSISTANT TO THE PRESIDENT
FOR NATIONAL SECURITY AFFAIRS

This responds to your request for our legal opinion on whether there are any legal prohibitions under United States law precluding the President and members of his Administration from encouraging private parties to contribute funds to the National Opposition Union ("UNO") for use in the scheduled Nicaraguan elections. As we understand the proposal, the Administration would not itself contribute funds, nor would it collect funds from others for delivery to UNO. The Administration would merely encourage those who might be interested to make contributions directly to the party for use in the campaign.

After a careful review, we have discovered no provision of United States law which would prevent the President or members of his Administration from encouraging private donors to contribute funds to a foreign political party for use in a foreign election. The Legal Adviser of the State Department has independently reviewed the legal authorities and has reached the same conclusion.

Certain statutes prohibit the provision of funds or other assistance by the United States to the "Nicaraguan Resistance" or the "Nicaraguan democratic resistance." *See, e.g.,* Pub. L. No. 101-14, § 7(a), 103 Stat. 37, 38 (1989); Pub. L. No. 100-463, 102 Stat. 2270 (1988); Pub. L. No. 100-453, § 104, 102 Stat. 1904, 1905 (1988). Such statutes are inapplicable to the current proposal because the actions contemplated are not intended to support the activities of the Nicaraguan Resistance, a military organization, but rather the political activities of UNO, a separate political entity. Further, we do not believe that such statutes prevent the President and members of his Administration from encouraging private donations, as opposed to providing United States assistance.

Nor do we believe that the Act to Provide Assistance for Free and Fair Elections in Nicaragua, Pub. L. No. 101-119, 103 Stat. 699 (1989), restricts the President or members of his Administration from encouraging private donations. That law made certain funds available to the Administrator of the Agency for International Development "for assistance for the promotion of

7

democracy and national reconciliation in Nicaragua." Certain categories of funds may only be made available "consistent with" the Charter, or both the Charter and the standard operating procedures, of the National Endowment for Democracy. The National Endowment for Democracy is "a private, non-profit corporation . . . which is not an agency or establishment of the United States Government." 22 U.S.C. § 4411. The Endowment receives grants from the United States Information Agency. Id. § 4412. However, "[f]unds may not be expended, either by the Endowment or by any of its grantees, to finance the campaigns of candidates for public office." Id. § 4414(a)(1).

The proviso in Public Law No. 101-119 restricting the use of funds made available therein clearly applies only to the funds administered under that Act. Thus, it cannot be construed to express any congressional intent to prohibit the President or members of his Administration from encouraging private financial support for UNO. The proposal does not involve making any appropriated funds available to UNO, much less funds covered by the proviso in Public Law No. 101-119. We thus do not see how the proposed activity could be in contravention of that act.

The proposal also would not implicate the Obey Amendment to the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101-167, § 582, 103 Stat. 1195, 1251.[1] The Obey Amendment prohibits the provision of the funds appropriated in Public Law No. 101-167 to any foreign government, foreign person, or United States person in exchange for undertaking any action which a United States official or employee would be expressly prohibited from taking under a provision of United States law. The Obey Amendment restrictions thus apply only to funds appropriated under the Foreign Operations Act. Those restrictions are inapplicable here because the proposal, as we understand it, would not involve the provision of funds appropriated in the Act to any person or foreign

---

[1] The Obey Amendment provides in its entirety:
(a) None of the funds appropriated by this Act may be provided to any foreign government (including any instrumentality or agency thereof), foreign person, or United States person in exchange for that foreign government or person undertaking any action which is, if carried out by the United States Government, a United States official or employee, expressly prohibited by a provision of United States law.
(b) For the purpose of this section the term "funds appropriated by this Act" includes only (1) assistance of any kind under the Foreign Assistance Act of 1961; and (2) credits, and guaranties under the Arms Export Control Act.
(c) Nothing in this section shall be construed to limit —
(1) the ability of the President, the Vice President, or any official or employee of the United States to make statements or otherwise express their views to any party on any subject;
(2) the ability of an official or employee of the United States to express the policies of the President; or
(3) the ability of an official or employee of the United States to communicate with any foreign country government, group or individual, either directly or through a third party, with respect to the prohibitions of this section including the reasons for such prohibitions, and the actions, terms, or conditions which might lead to the removal of the prohibitions of this section.
Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101-167, § 582, 103 Stat. 1195, 1251.

government. Further, we are aware of no provision of United States law expressly prohibiting the United States from contributing funds to UNO.[2] Finally, the Obey Amendment specifically states that it shall not be construed to limit "the ability of the President, the Vice President, or any official or employee of the United States to make statements or otherwise express their views to any party on any subject," nor to limit "the ability of an official or employee of the United States to express the policies of the President."

We have also reviewed the Hatch Act, 5 U.S.C. § 7324(a)(1), and conclude that it does not restrict Administration officials from encouraging donations to a foreign political party. Section 7324(a)(1) prohibits "[a]n employee in an Executive agency" from "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election." We do not believe this provision applies extraterritorially to foreign elections. Laws are presumed to apply only territorially, unless the contrary is clearly indicated in the the the statute. Restatement (Second) of Foreign Relations Law of the United States § 38 (1965). *Accord* 1 Restatement (Third) of the Foreign Relations Law of the United States § 403, cmt. g (1987). *See American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 357 (1909) ("All legislation is *prima facie* territorial.").

Even without that presumption, it is clear that Congress's concern in enacting the Hatch Act was the interaction of federal employees with the domestic political process. As the Supreme Court noted in upholding section 7324(a)(2) against a First Amendment challenge, the political history of the United States has confirmed that "it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on *the electoral process* should be limited." *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973) (emphasis added). Congress was concerned about attempts to utilize federal employees to staff domestic political machines, and wished to free such employees from coercion to vote on partisan lines or to perform political tasks in domestic elections. *Id.* at 565-66. As described by one Congressman, "[t]his proposed legislation seeks only to make certain the inherent right of every citizen of our land of the freedom of the ballot and his or her right to vote as they may elect without interference from illicit political manipulators." 84 Cong. Rec. 9603 (1939) (remarks of Rep. Springer).[3]

---

[2] As discussed above, Public Law No. 101-119 does not constitute an express prohibition, but merely a limitation on the use of certain specified funds.

[3] Further, we note that the President and Vice President are clearly not bound by the statute because they are not "employee[s]" as that term is used in title 5. *See* 5 U.S.C. § 2105. A specific exemption for the President and Vice President was removed from section 7324(d) as unnecessary. *See* 5 U.S.C. § 7324, Historical and Revision Notes.

We also believe that the Anti-Lobbying Act, 18 U.S.C. § 1913, is inapplicable because Presidential encouragement of support for UNO would not in any way be "intended or designed to influence in any manner *a Member of Congress.*" 18 U.S.C. § 1913 (emphasis added).

We are aware that 31 C.F.R. § 540.205 prohibits the export of "goods" to Nicaragua. But a prohibition on export of "goods" does not apply to political contributions of money. Indeed, the regulation was promulgated under the authority given the President by the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, where the distinction between orders blocking "goods" and those blocking "property," including monetary payments, is well established. *Compare* 31 C.F.R. § 535.201 (prohibiting all Iranian "property" in the United States from being "transferred, paid, exported, withdrawn or otherwise dealt in except as authorized").

Moreover, even if some provision of law purported to prohibit the President from encouraging financial support for UNO, we do not believe that the law would be constitutional. The Department of Justice made this point publicly:

> [N]o law can constitutionally prevent the President or his aides under his authority from urging private citizens to contribute funds for foreign entities to which donations can legally be made. The President has independent authority from two distinct sources to solicit such funds. First and foremost, the President "is a representative of the people, just as the members of the Senate and of the House are." *Myers v. United States,* [272 U.S. 52, 123 (1926)]. It is therefore essential that the President be able to engage in a dialogue with the citizens of the United States. He would be unable to fulfill many of his constitutional duties if he were not permitted to communicate with those people whom he represents and to ask them to undertake any legal act.
>
> Moreover . . . in the area of foreign affairs the President's powers are "plenary and exclusive." [*United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936)]. This requires that he be free to gauge public opinion and to lead the country in the direction he thinks most prudent. He may inform the public of their legal rights and responsibilities and encourage them to take any legal action that would support one of his foreign policy positions.

Memorandum of Law of the United States Filed by the Department of Justice as Amicus Curiae, *United States v. North,* Crim. No. 88-0080-02 at 30-31 (D.D.C. Nov. 18, 1988).

We are not aware of any reporting requirement which would be applicable to actions of the sort contemplated in the proposal. In particular, we

do not believe that Administration officials encouraging donations to a foreign political party would be required to register as "agents of a foreign principal" pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. §§ 611-621. That statute provides that "[n]o person shall act as an agent of a foreign principal unless" he has registered with the Attorney General or is exempt from the registration requirements. 22 U.S.C. § 612(a). The term "foreign principal" includes a foreign political party. *Id.* § 611(b)(1). An "agent of a foreign principal" is

> any person who acts as an agent, representative, employee, or servant, or *any person who acts in any other capacity at the* order, *request*, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, *and who directly or through any other person—*
>
>> (i) *engages within the United States in political activities for or in the interests of such foreign principal*;
>>
>> (ii) *acts within the United States as a public relations counsel*, publicity agent, information-service employee *or political consultant for or in the interests of such foreign principal*;
>>
>> (iii) *within the United States solicits, collects, disburses, or dispenses contributions*, loans, money, or other things of value *for or in the interest of such foreign principal.*

22 U.S.C. § 611(c)(1) (emphasis added).

We do not believe a government official, acting on behalf of the United States to carry out its foreign policy, is acting "as an agent, representative, employee, or servant, or . . . at the order, request, or under the direction or control, of a foreign principal" within the meaning of section 611(c)(1). Such officials are acting under the direction and control of the United States, rather than of the foreign principal, and they act to further the interests of the United States, which may or may not coincide with those of the foreign entity. Moreover, this reading best comports with the purposes of the Foreign Agents Registration Act. "The general purpose of the legislation was to identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment." *Viereck v. United States*, 318 U.S. 236, 241 (1943). Thus, the aim of the legislation was to protect the United States Government from outside threats, rather than to constrain the duly authorized actions of government officials.

Furthermore, we do not believe that the contemplated conduct would violate the ethics laws.[4] As a general matter, however, all officials who will be involved in providing such encouragement should be careful to avoid any appearance of impropriety.[5] Thus, for example, it would be unwise for an

11

official to encourage a contribution from a corporation that has a direct interest in a matter pending before the official, even if there is no indication of a quid pro quo. It is, of course, impossible to detail all such situations in advance; in order to avoid any appearance of impropriety, additional advice should be sought from the White House Counsel's Office as particular questions arise.

Finally, the proposed arrangement could not be deemed an improper augmentation of executive branch appropriations. Mere encouragement of private activity does not constitute augmentation. Private individuals would be making contributions directly to UNO, rather than to the United States Government. The government would exercise no control over the donated funds. Thus, funds available for executive branch purposes would not be increased.

The foregoing addresses the Administration's encouragement of donations to foreign political parties as a matter of domestic law. We have been informed by the State Department that foreign donations are legal under Nicaraguan law if they comply with certain procedures. We understand that members of the Administration will encourage donors to contact UNO, which will then take responsibility for complying with Nicaraguan law. Were a donor to violate Nicaraguan law, he would presumably be subject to prosecution in that country. Even if the actions of a donor were found illegal under Nicaraguan law, however, that fact alone would not make the actions of the donor, or of any Administration official who had encouraged him, improper under United States law. While we do not address generally the international law implications of these actions, we note that the encouragement of acts that are legal under Nicaraguan law could not be viewed under international law as interfering with Nicaragua's internal affairs.[6]

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

---

[4] For example, section 208 of title 18, United States Code, which concerns official acts affecting a personal financial interest, would only apply if an official had knowledge that he, or certain other persons with whom he is associated, had a financial interest that would be affected by the provision of money to UNO. This statute might conceivably apply if assistance to UNO were channeled through persons or entities in which an official involved, or persons with whom he is associated, had a financial interest.

[5] In particular, officials should not in any way indicate that they will be influenced in the performance of their duties in return for contributions to UNO. Such conduct would violate the federal bribery statute. 18 U.S.C. § 201(b)(2) ("Whoever ... being a public official ... directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally *or for any other person or entity*, in return for ... being influenced in the performance of any official act ... [shall be punished as prescribed].") (emphasis added).

[6] While we do not believe there is any general legal prohibition against contributions to Nicaraguan political parties, we have not addressed legal restraints which may be applicable to donors in specific situations. Thus, donors interested in doing business in Nicaragua may wish to consider the applicability of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, 78dd-2.